IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| INTERNATIONAL FIDELITY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) Case No. 3:12-CV-37 ) ) |
| v. | ) Evidentiary Hearing Requested ) |
| SOLUTIONS TO EVERY PROBLEM, INC., BASIL A. SKELTON, JEFFREY L. WOOD, IDA SALISA WOOD, NICKAJACK PROPERTIES, LLC, and COOL SPORTS, LLC | ) ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF INTERNATIONAL FIDELITY INSURANCE COMPANY'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff International Fidelity Insurance Company ("International Fidelity"), by and through counsel, respectfully submits this Memorandum of Law in Support of International Fidelity's Motion for Preliminary Injunction against Defendants Solutions to Every Problem, Inc. ("STEP"), Basil A. Skelton (individually and in his capacity as the trustee of Basil A. Skelton's Living Trust), Jeffrey L. Wood, Ida Salisa Wood, Nickajack Properties, LLC, and Cool Sports, LLC (Mr. Skelton, Mr. Wood, Ms. Wood, Nickajack Properties, LLC, and Cool Sports, LLC collectively, the "Indemnitors").

**I. INTRODUCTION AND SUMMARY OF ARGUMENT**

International Fidelity seeks the entry of a preliminary injunction compelling STEP and the Indemnitors to perform their contractual duty to deposit collateral with International Fidelity

— as they expressly agreed to do as an inducement of International Fidelity's execution of a number of surety bonds on behalf of STEP. Based upon the total reserve that International Fidelity has established in relation to the liability that has been asserted it under a performance bond it issued on behalf of STEP, International Fidelity seeks to compel STEP and the Indemnitors to deposit of collateral totaling $427,556.46.[1]

By way of background, STEP and the Indemnitors executed the Agreement of Indemnity attached hereto as **Exhibit 1** (the "Indemnity Agreement") as an inducement of International Fidelity's issuance of surety bonds on behalf of STEP. Among other things, the Indemnity Agreement jointly and severally obligates STEP and the Indemnitors "to exonerate, indemnify, and keep indemnified [International Fidelity] from and against any and all liability for losses and/or expenses of whatsoever kind or nature" that International Fidelity may sustain by reason of issuing surety bonds on behalf of STEP.

More importantly for purposes of this Motion, the Indemnity Agreement also jointly and severally obligates STEP and the Indemnitors to "deposit with [International Fidelity] on demand an amount of money or other collateral security acceptable to [International Fidelity], as soon as liability exists or is asserted against [International Fidelity], whether or not [International Fidelity] shall have made any payment therefor." Once liability is asserted against International Fidelity, the amount of collateral to be deposited under the Indemnity Agreement "shall be equal to the amount of the reserve set by [International Fidelity]." The Indemnity Agreement also expressly grants International Fidelity "the right to use the deposit, or any portion thereof, in

---

[1] As explained more fully herein, International Fidelity has paid a number of claims since its total reserve was established. Nonetheless, the Indemnity Agreement requires STEP and the Indemnitors to deposit collateral in the amount of International Fidelity's reserve "whether or not [International Fidelity] shall have made any payment therefor." Accordingly, notwithstanding International Fidelity's payment of a number of claims, it is entitled to the deposit of collateral in amount of its total reserve.

payment or settlement of any liability, loss, or expense for which [STEP] and Indemnitors would be obligated to indemnify [International Fidelity] under the provisions of this Agreement."

To date, liability has been asserted against International Fidelity under a performance bond it issued on behalf of STEP, and International Fidelity has established a total reserve in the amount of $427,556.46 relative to the liability that has been asserted against it under that performance bond. However, despite International Fidelity's demand, STEP and the Indemnitors have refused to deposit **any** collateral with International Fidelity.

Accordingly, International Fidelity's Complaint for Indemnity and Equitable Relief seeks, *inter alia*, specific performance of STEP's and the Indemnitors' contractual duty to deposit collateral with International Fidelity. International Fidelity is entitled to specific performance of the contractual obligation to deposit collateral under Tennessee law, which governs this diversity action, because International Fidelity does not possesses an adequate remedy at law for STEP's and/or the Indemnitors' breach of their duty to collateralize International Fidelity. In fact, both this Court and the United States District Court for the Middle District of Tennessee (the "Middle District") have held that similar collateral security provisions were specifically enforceable under Tennessee law.

As the Middle District also recently held, International Fidelity is also entitled to the entry of a preliminary injunction compelling STEP and/or the Indemnitors to perform their contractual duty to deposit collateral under the four-part test utilized in the Sixth Circuit. First, a substantial likelihood exists that International Fidelity will succeed on the merits of its claims for specific performance under Tennessee law for the reasons set forth above. Second, International Fidelity would continue to suffer irreparable harm unless STEP and the Indemnitors are compelled to deposit collateral with International Fidelity because International Fidelity would

continue to be deprived of its bargained-for right to receive and hold collateral pending the resolution of International Fidelity's potential liability. Third, the balance of the equities weighs in International Fidelity's favor because it is merely seeking to enforce the clear and unambiguous terms of the Indemnity Agreement to which STEP and the Indemnitors voluntarily agreed. To the extent the deposit of collateral may cause STEP and/or the Indemnitors to suffer financial hardship, that is exactly the risk they voluntarily assumed when they executed the Indemnity Agreement. Finally, the issuance of a preliminary injunction against STEP and the Indemnitors will further Tennessee's public interest of enforcing the plain and unambiguous terms of indemnity agreements, as well as the public interest of encouraging confidence in the surety industry.

Therefore, International Fidelity is entitled to the entry of a preliminary injunction compelling STEP and the Indemnitors to deposit collateral with International Fidelity in the amount of $427,556.46, which equals the amount of the International Fidelity's total reserve in relation to the liability that has been asserted against it.

## II. STATEMENT OF FACTS

**A. By executing the Indemnity Agreement, STEP and the Indemnitors expressly agreed to deposit collateral with International Fidelity, upon demand, in an amount equal to International Fidelity's total reserve — regardless of whether International Fidelity has paid any bond claims.**

STEP and the Indemnitors are contractually obligated to deposit collateral with International Fidelity, upon demand, in the amount of any reserve that International Fidelity establishes in relation to any liability that is asserted against it under any surety bond it issued on behalf of STEP. As noted above, STEP and the Indemnitors executed the Indemnity Agreement as an inducement of International Fidelity's issuance of surety bonds on behalf of STEP. (Affidavit of Frank Tanzola ("Tanzola Affidavit"), ¶ 2, Ex. 1). With respect to the duty of STEP

and the Indemnitors to fully indemnify International Fidelity in relation to any losses/liability it might sustain as a result of issuing bonds on behalf of STEP, Paragraph SECOND of the Indemnity Agreement provides:

> [STEP] and Indemnitors shall exonerate, indemnify, and keep indemnified [International Fidelity] from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and the cost of services rendered by counsel, investigators, accountants, engineers or other consultants, whether consisting of in-house personnel or third party providers) and from and against any and all such losses and/or expenses which [International Fidelity] may sustain and incur:
>
> (1) By reason of having executed or procured the execution of the Bonds,
> (2) By reason of the failure of [STEP] or Indemnitors to perform or comply with the covenants and conditions of this Agreement or
> (3) In enforcing any of the covenants and conditions of this Agreement.

(Id., Ex. 2). With respect to the duty of STEP and the Indemnitors to deposit collateral with International Fidelity in the amount of its reserve, Paragraph SECOND of the Indemnity Agreement further provides:

> [STEP] and Indemnitors shall deposit with [International Fidelity] on demand an amount of money or other collateral security acceptable to [International Fidelity], as soon as liability exists or is asserted against [International Fidelity], whether or not [International Fidelity] shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by [International Fidelity].

(Id.). With respect to International Fidelity's right to use any such collateral to satisfy bond claims, Paragraph SECOND also provides:

> [International Fidelity] shall have the right to use the deposit, or any portion thereof, in payment or settlement of any liability, loss, or expense for which [STEP] and Indemnitors would be obligated to indemnify [International Fidelity] under the provisions of this Agreement. If for any reason [International Fidelity] deems it necessary to increase its reserve to cover any possible additional liability or loss, [STEP] and Indemnitors shall deposit with [International Fidelity], immediately upon [International Fidelity]'s demand, an additional amount of collateral security equal to such increase. [International Fidelity] shall have no obligation to invest or to provide a return on any such deposits. [International Fidelity] may sell or realize upon any and all such collateral security, at public or

> private sale, with or without notice to [STEP] and Indemnitors, or by any other method permitted or applicable by law.

(Id.). With the respect to the method of accounting for International Fidelity's use of any such collateral to satisfy bond claims, Paragraph SECOND also provides:

> In the event of any payment by [International Fidelity] [STEP] and Indemnitors further agree that in any accounting between [International Fidelity] and [STEP], or between [International Fidelity] and the Indemnitors, or either or both of them, [International Fidelity] shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed. The vouchers or other evidence of any such payment(s) made by [International Fidelity] shall be prima facie evidence of the fact and amount of the liability to [International Fidelity], and of [International Fidelity]'s good faith in making the payment(s). "Good Faith," as used in this paragraph and elsewhere in this Agreement, shall mean honesty in fact and the absence of willful misfeasance or malfeasance. Neither negligence nor gross negligence shall be deemed the absence of good faith.

(Id.).

As a corollary of International Fidelity's right to utilize any deposited collateral to resolve claims, Paragraph SIXTH of the Indemnity Agreement also expressly grants International Fidelity the right to take over and complete any contract for which it issued surety bonds on behalf of STEP:

> In the event of any breach, delay or default asserted by the obligee in any said Bonds, or [STEP] has suspended or ceased work on any contract or contracts covered by any said Bonds, or failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, [STEP]'s conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of [STEP], or the appointment of a receiver or trustee for [STEP], or the property of [STEP], or in the event of' an assignment for the benefit of creditors of [STEP], or if any action is taken by or against [STEP] under or by virtue of the U.S. Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against [STEP] under said Code, or if any action is taken by or against [STEP] under the insolvency laws of any state, possession, or territory of the United States, **[International Fidelity] shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to**

> **take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of [STEP] and Indemnitors to complete or arrange for the completion of the same, and [STEP] and Indemnitors shall promptly upon demand pay to [International Fidelity] all losses, and expenses so incurred**.

(Id.) (emphasis added). As another corollary of International Fidelity's right to utilize any deposited collateral to resolve claims, Paragraph THIRTEENTH of the Indemnity Agreement also expressly grants International Fidelity the right to adjust, settle, or compromise any claim asserted against it under any bond it issued on behalf of STEP:

> **[International Fidelity] shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds**, *unless* [STEP] and the Indemnitors shall demonstrate to [International Fidelity]'s satisfaction that there is a valid basis to dispute said claim, demand, suit or judgment, and shall in good faith request [International Fidelity] to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, **and shall deposit with [International Fidelity], at the time of such request, cash or collateral satisfactory to [International Fidelity] in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of [International Fidelity]**.

(Id.) (emphasis added).

   **B. Liability has been asserted against International Fidelity by reason of its issuance of a "Performance-Payment Bond" on behalf of STEP, and International Fidelity has established a total reserve in the amount of $427,556.46 in relation to the liability that has been asserted against it under the "Performance-Payment Bond."**

Induced by and in consideration of STEP's and the Indemnitors' execution of the Indemnity Agreement, International Fidelity issued the Performance-Payment Bond attached hereto as **Exhibit 2** (the "Bond") on behalf of STEP in the penal sum of $3,299,036.06. (Tanzola Affidavit, ¶ 3, Ex. 2). The Bond relates to a contract (the "Bonded Contract") between STEP and Dalewood Estates Senior Housing, Inc. ("Dalewood") for the construction of a senior housing community in Albany, Georgia.[2] (Id.). Dalewood and a number of STEP's

---

[2] Dalewood and the Secretary of Housing and Urban Development ("HUD") are dual obligees under the Bond.

subcontractors and suppliers have asserted claims against International Fidelity under the Bond. (Id.).

Specifically, after a number of disputes arose between STEP and Dalewood during the life of the Bonded Contract, Dalewood deemed STEP to be in default and formally terminated the Bonded Contract on January 26, 2011. (Id., ¶ 4). Upon information and belief, representatives of Dalewood and local law enforcement officers in Albany, Georgia also escorted STEP's employees off of the project site on January 26, 2011. (Id.). Dalewood subsequently asserted a claim against International Fidelity under the Bond and sought recovery of, *inter alia*, the cost to complete STEP's unfinished work under the Bonded Contract, liquidated damages, and lost income. (Id.). Hatcher Tractor Service ("Hatcher"), Select Tel Systems, Inc. ("STS"), and Pressley's Electric Service, Inc. ("PES"), who were among STEP's subcontractors/suppliers under the Bonded Contract, also asserted claims against the Bond and each filed suit against International Fidelity and STEP. (Id.). In their respective lawsuits, Hatcher sought to recover in excess of $104,501.58, STS sought to recover in excess of $23,376.24, and PES sought to recover in excess of $52,876.05 from International Fidelity under the Bond. (Id.).

In anticipation of potential litigation with Dalewood, STEP's subcontractors/suppliers, and/or STEP and the Indemnitors, International Fidelity retained construction consultant Gary Bierhalter of Bierhalter & Associates, Inc. in April of 2011 to assist in International Fidelity's independent investigation of the various claims that were asserted against International Fidelity under the Bond. (Id., ¶ 5). On numerous occasions, International Fidelity and/or its consultant requested information from STEP and the Indemnitors relative to those claims, but International Fidelity only received small portions of the information it requested. (Id.). At this juncture,

International Fidelity has settled some of the claims that were asserted against it, but International continues to face substantial exposure under the Bond. (Id.).

For example, at STEP's request, and as reflected by the June 10, 2011 letter attached hereto as **Exhibit 3**, International Fidelity tendered payment in the amount of $91,556.46 to STEP's attorney to fund the settlement of Hatcher's claim against the Bond. (Id., ¶ 6, Ex. 3). STEP later used those funds to settle Hatcher's claim against the Bond, and the Hatcher Lawsuit was ultimately dismissed with prejudice. (Id., ¶ 6). International Fidelity has tendered payment in the amount of $31,859.01 to PES to partially resolve PES's claim against International Fidelity under the Bond, but PES's lawsuit has not yet been dismissed. (Id.). After months of International Fidelity's investigation of Dalewood's claim against the Bond, International Fidelity and Dalewood ultimately entered into a Takeover Agreement dated November 21, 2011, a copy of which is attached hereto as **Exhibit 4** (the "Takeover Agreement"). (Id., ¶ 6, Ex. 4). As more fully set forth in the Takeover Agreement, International Fidelity has elected, pursuant to Paragraph SIXTH of the Indemnity Agreement, to utilize Bob Martin of CEM Enterprises ("CEM") and one or more of STEP's subcontractors and/or suppliers to complete a negotiated scope of work (the "Remaining Work") in fulfillment of International Fidelity's duties and obligations to Dalewood and HUD under the Bond. (Id.).

At this juncture, International Fidelity is utilizing CEM and one or more of STEP's subcontractors and/or suppliers to complete the Remaining Work pursuant to the Takeover Agreement. (Id., ¶ 7). The STS Lawsuit remains unresolved, and International Fidelity continues to face exposure to STS under the Bond. (Id.). Based upon the foregoing, International Fidelity established a total reserve of $427,556.46 relative to the claims that Dalewood, Hatcher, STS, and PES have asserted against the Bond. (Id.).

**C. Despite International Fidelity's demand, STEP and the Indemnitors have failed to deposit any collateral with International Fidelity in violation of Paragraph SECOND of the Indemnity Agreement.**

As reflected by the December 5, 2011 letter attached hereto as **Exhibit 5**, International Fidelity previously demanded that STEP and the Indemnitors deposit collateral with International Fidelity in the amount of $336,000, which sum did not include the $91,556.46 payment that International Fidelity advanced to STEP to settle Hatcher's claim against the Bond. (Id., ¶ 8, Ex. 5). However, despite International Fidelity's demand, neither STEP nor the Indemnitors have deposited **any** collateral with International Fidelity. (Id., ¶ 8). To date, International Fidelity has paid $343,518.74 in losses and/or expenses under the Bond, and International Fidelity anticipates that it could incur an additional $110,996.40 in losses and expenses under the Bond (exclusive of the cost and expenses associated with this action).

## III. STANDARD FOR PRELIMINARY INJUNCTION

Fed. R. Civ. P. 65 authorizes the Court to issue a preliminary injunction compelling STEP and the Indemnitors to specifically perform their contractual duty to collateralize International Fidelity in relation to the reserve it has established. The United States Court of Appeals for the Sixth Circuit recently embraced the following four-part test for the issuance of a preliminary injunction:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities weighs in his favor, and that an injunction is in the public interest.

*Langley v. Prudential Mortg. Capital Co.*, 554 F.3d 647 (6th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). As explained below, these considerations warrant the issuance of a preliminary injunction against STEP and the Indemnitors in the present case.

## IV. ARGUMENT AND CITATION OF AUTHORITIES

### A. First Prong: International Fidelity will likely succeed on the merits of its claim for specific performance against STEP and the Indemnitors under Tennessee law because International Fidelity lacks an adequate remedy at law in relation to their failure to collateralize International Fidelity.

The contractual duty of STEP and the Indemnitors to deposit collateral with International Fidelity upon demand is specifically enforceable under Tennessee law, and International Fidelity will, therefore, likely succeed on the merits of its claim for specific performance against STEP and the Indemnitors. As a preliminary matter, federal courts interpreting Tennessee law have noted on multiple occasions that "[i]ndemnity agreements are enforceable under Tennessee law, and like other contracts, **they are to be enforced according to their plain and unambiguous terms**." *U.S. Fid. & Guar. Co. v. Weed*, 2009 WL 77262, *3-*4 (M.D. Tenn. Jan. 8, 2009); *Ohio Farmers Ins. Co. v. Special Coatings, LLC*, 2008 WL 5378079, *16-*17 (M.D. Tenn. Dec. 28, 2008) (emphasis added).[3] When interpreting an indemnity agreement under Tennessee law, "[t]he courts should give the words of the indemnity agreement their natural and ordinary meanings, **and must give meaning and effect to every provision of the agreement**." *Long v. McAllister*, 221 S.W.3d 1, 11 (Tenn. Ct. App. 2006) (emphasis added) (internal citations omitted). Furthermore, like any other contract, "the clear language must be interpreted and enforced as written **even though it contains terms which may be considered harsh and unjust by a court**." *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 511 (Tenn. 2001) (emphasis added). In fact, this Honorable Court has previously recognized that:

> In Tennessee, there is no case law to suggest indemnity agreements would be read any differently than regular contracts. Thus, unless the context otherwise requires, indemnity agreements should be applied according to their terms. While the terms of a contract are generally a question of fact, interpretation of the contract is a question of law.

---

[3] All foreign and unreported decisions are attached to this memorandum of law in reverse chronological order.

*Lyndon Prop. Ins. Co. v. Houston Barnes, Inc.*, 2005 WL 1840254, *4 (E.D. Tenn. July 26, 2005).

With respect to the remedy of specific performance, "[the] remedies available for breach of contract are damages, specific performance, and restitution" under Tennessee law. *Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108, 110 (Tenn. Ct. App. 1975). The remedy of specific performance is "the substitute for a legal remedy of compensation (damages) whenever the legal remedy is inadequate or impracticable" under Tennessee law. *Rogers v. Roop*, 92 S.W.2d 423, 429 (Tenn. Ct. App. 1935) (citing *New River Lumber Co. v. Tennessee Railway Co.*, 191 S. W. 334 (Tenn. 1916)). The inability to prove or measure the actually monetary damages resulting from a particular breach of contract may make the damages remedy inadequate so as to justify specific performance under Tennessee law. *Williamson County Broadcasting Co. v. Intermedia Partners*, 987 S.W.2d 550, 554 (Tenn. Ct. App. 1998).

Accordingly, STEP's and the Indemnitors' duty to deposit collateral with International Fidelity is specifically enforceable under Tennessee law because International Fidelity lacks an adequate remedy at law as to the breach of that duty. In fact, this Court previously offered the following explanation while enforcing a collateral security provision via specific performance under Tennessee law:

> Under its indemnity agreement, the [surety] is entitled to require the defendants to pay an amount sufficient to discharge any claim made under any bond on which the plaintiff is a surety. **"Sureties are ordinarily entitled to specific performance of [such] collateral security clauses." The Court finds that the [surety] is entitled to recover the amount of this bond to hold as collateral against its ultimate liability to be adjudged in the litigation** . . . and to recover also its expenses incurred in defending itself in this matter.

*Safeco Ins. Co. of Am. v. Criterion Investment Corp.*, 732 F. Supp. 834, 843 (E.D. Tenn. 1989). (emphasis added) (internal citations omitted). The Middle District also recently held that a similar collateral security provision was specifically enforceable under Tennessee law. *Great American Ins. Co. v. SRS, Inc.*, 2011 WL 6754072 (M.D. Tenn. Dec. 23, 2011). Moreover, courts throughout the United States have held that sureties such as International Fidelity lack an adequate remedy at law relative to the breach of a collateral security provision.[4] Collateral security provisions are routinely enforced via specific performance even if the principal or

---

[4] *See, e.g., Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431 (9th Cir. 1984) (stating that "sureties are ordinarily entitled to specific performance of collateral security clauses" and that "[i]f a creditor is to have the security position for which it bargained, the promise to maintain the security must be specifically enforced"); *Milwaukee Constr. Co. v. Glens Falls Ins. Co.*, 367 F.2d 964 (9th Cir. 1966) (explaining that the legal remedy of money damages was not adequate and specific performance was available to require the indemnitors to deposit with surety money or acceptable security equal to established reserves"); *First Nat'l Ins. Co. of Am. v. Sappah Brothers, Inc.*, 2011 WL 650553 (E.D.N.C. Feb. 18, 2011) (noting that courts "routinely recognize that 'a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages"); *Kearney Constr. Co., LLC v. Travelers Cas. & Sur. Co. of Am.*, 2010 WL 2803971 (M.D. Fla. July 15, 2010) (stating that a surety "is without an adequate remedy at law to the extent that if equitable relief was not granted, it would be forced to continue to use its own funds in defense of the claims against the Indemnitors"); *Hartford Fire Ins. Co. v. Universal Import, LLC*, 2009 WL 4042699 (D. Nev. Nov. 20, 2009) (recognizing that the surety did "not have an adequate remedy at law for recovery of the $50,000 it [sought] under the collateral security provision"); *Travelers Cas. & Sur. Co. of Am. v. Grace & Naeem Uddin, Inc.*, 2009 WL 1024239 (S.D. Fla. Apr. 15, 2009) (rejecting argument that surety possessed an adequate remedy at law for breach of a collateral security provision); *Hartford Cas. Ins. Co. v. Cal-Tran Assoc.*, 2008 WL 4165483 (D.N.J. Sep. 4, 2008) (granting specific performance because "[t]he damage resulting from the failure to give security is not ascertainable, and the legal remedy is therefore inadequate"); *Fid. & Dep. Co. of Md. v. D.M. Ward Constr. Co.*, 2008 WL 2761314 (D. Kan. July 14, 2008) (reasoning that "[w]en a surety has demanded that a principal post collateral security and the principal refused, the legal remedy of damages is not adequate"); *Int'l Fid. Ins. Co. v. Anchor Envtl., Inc.,* 2008 WL 1931004 (E.D. Pa. May 1, 2008) (noting that collateral security provisions are specifically enforceable under Pennsylvania law); *Travelers Cas. & Sur. Co. of Am. v. Southwest Contracting, Inc.*, 2006 WL 276942 (E.D. Pa. Feb. 2, 2006) (holding that surety was entitled to specific performance of collateral security provision); *U.S. Fid. & Guar. Co. v. Stanley Contracting, Inc.*, 303 F. Supp. 2d 1169 (D. Or. 2004) (granting specific performance and requiring indemnitors to post security in order to protect the surety from future losses); *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915 (E.D.N.Y. 1999) (noting that "[c]ourts in New York have routinely upheld the validity of collateral security clauses and enforced their terms" and that "[w]here liability had not yet been determined but claims were expected, the surety had no legal remedy under that provision for an indemnification award, but it did have an equitable remedy for specific performance of the collateral security provision"); *U.S. Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, (M.D. Pa. 1998) (explaining that courts have granted specific performance of collateral security provisions to protect surety's bargained for rights of pre-loss protections); *Ticor Title Ins. Co. v. Middle Street Office Tower A Assoc.*, 768 F. Supp. 390 (D. Me. 1991) (stating that it is "clear that specific performance is available as a remedy for breach of an indemnity agreement when it is in the nature of a collateral security agreement"); *United Bonding Ins. Co. v. Stein*, 273 F. Supp. 929 (E.D. Pa. 1967) (explaining that legal remedy for subsequent damages will not suffice when indemnitor refuses to voluntarily comply with surety's demands for collateral); *Jhala v. Patel*, 154 S.W.3d 12 (Mo. Ct. App. 2004) (explaining that money damages is not an adequate remedy for failure to post collateral); *BIB Constr., Inc. v. Fireman's Ins. Co. of Newark, N.J.*, 214 A.D.2d 521 (N.Y. App. Div. 1995) (stating that "damages resulting from failure to give security is not ascertainable, and the legal remedy is therefore inadequate").

indemnitors are asserting defenses to the underlying bond claims and/or to their indemnity obligations.[5] Therefore, because it is undisputed that STEP and the Indemnitors have failed to deposit collateral in relation to International Fidelity's reserve, International Fidelity will likely succeed on the merits of its claim for specific performance and has satisfied the first prong of the test for the issuance of a preliminary injunction.

> **B. Second Prong: International Fidelity will continue to suffer irreparable harm if STEP and the Indemnitors are not compelled to deposit collateral because it will continue to be deprived of its bargained-for right to receive and hold collateral pending the resolution of the liability that has been asserted against it.**

Not only will International Fidelity likely succeed on the merits of its claim for specific performance, but International Fidelity will also continue to suffer irreparable harm if STEP and the Indemnitors are not compelled to deposit collateral with International Fidelity as they expressly agreed to do by executing the Indemnity Agreement. The Middle District recently recognized that a surety would suffer irreparable harm absent the entry of an injunction compelling the indemnitors to deposit $1,000,000 with the surety under a similar collateral security provision. *SRS*, 2011 WL 6754072 at *9. Courts throughout the United States have also held that sureties suffer immediate, irreparable harm when their principals and indemnitors fail collateralize them. For example, the United States Court of Appeals for the Second Circuit has

---

[5] *See, e.g., First Nat'l Ins. Co. of Am. v. Sappah Brothers, Inc*., 2011 WL 650553 (E.D.N.C. Feb. 18, 2011) (stating "while the issue of whether [the surety] acted in good faith may be relevant to whether defendants ultimately are liable to [to the surety] for indemnification under their agreement, it is irrelevant to whether defendants are required to post collateral security preliminarily"); *Kearney Constr. Co., LLC v. Travelers Cas. & Sur. Co. of Am.*, 2010 WL 2803971 (M.D. Fla. July 15, 2010) (holding that the principal was required to deposit collateral with surety notwithstanding their assertion that "[the surety's] intentional actions caused [the principal] to lose the ability to complete their existing bonded jobs, obtain new bonded jobs, and ultimately forced [principal] out of business, resulting in the very claims for which [the surety] now seeks indemnification from [the principal]"); *Int'l Fid. Ins. Co. v. Vimas Painting Co*., 2009 WL 485494 (S.D. Ohio Feb. 26, 2009) (stating that "there is nothing in the language of the Indemnity Agreement to indicate that the parties intended to condition [the indemnitors'] payment of the $500,000 on a finding that [the surety] acted in good faith in demanding the collateral security"); *Far West Ins. Co. v. J. Metro Excavating, Inc.*, 2008 WL 859192 (N.D. Ind. Mar. 28, 2008) (requiring collateral to be deposited notwithstanding assertion that surety had failed to act in good faith); *Great Am. Ins. Co. v. Conart, Inc.*, 2006 WL 839197 (M.D. Ga. Mar. 29, 2006) (requiring collateral to be deposited notwithstanding assertion that surety had acted in bad faith).

noted that, "[h]aving bargained for collateral security and having failed to receive it, [a surety's] injury is real and immediate." *Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 302 (2d Cir. 1989). The United States District Court for the Eastern District of New York has also recognized that the injury to a surety resulting from the breach of a collateral security provision is immediate and irreparable because the surety "risk[s] being deprived of bargained-for collateral and becoming a general unsecured creditor . . . ." *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 923 (E.D.N.Y. 1999). The United States District Court for the Eastern District of Pennsylvania has also explained:

> If [the surety] is deprived of the bargained-for collateral security, it will face the risk of being a general unsecured creditor of [the indemnitors] and of not being able to collect. **To protect [the surety] from becoming a general creditor, the grant of specific performance to enforce the collateral security provision is warranted. [An indemnitors] argues that [the surety] will not be irreparably harmed, and that this court should delay an obvious ruling, because [the surety's] assets are great. This argument carries no weight.**

*Int'l Fid. Ins. Co .v. Anchor Envt'l., Inc.*, 2008 WL 1931004, *7 (E.D. Pa. May 1, 2008) (internal citations omitted) (emphasis added).

As dictated by these principles, International Fidelity's current lack of collateral constitutes an immediate and irreparable injury, and only a preliminary injunction compelling STEP and the Indemnitors to deposit collateral in the amount of International Fidelity's reserve can eliminate that injury. By its very nature, the collateral security provision contained in Paragraph SECOND of the Indemnity Agreement requires prejudgment relief and enforcement to have any value. As the Middle District recently recognized, the objectives of the collateral security provision include:

> (1) insuring that International Fidelity is fully collateralized BEFORE it sustains additional loss under the Bond;

(2) protecting International Fidelity from any loss that may otherwise result from insolvency and/or dissipation of assets by STEP or the Indemnitors during the resolution of International Fidelity's remaining exposure under the Bond and/or the resolution of this indemnity action;

(3) motivating STEP and the Indemnitors to promptly resolve (or at least cooperate with International Fidelity regarding the resolution of) the remaining claims that have been or may later be asserted against the Bond; and

(4) creating a fund from which International Fidelity may resolve the remaining claims that have been or may later be asserted against the Bond.

*SRS*, 2011 WL 6754072, *8. Absent the issuance of a preliminary injunction, NONE of these bargained-for objectives will be achieved, and International Fidelity would continue to suffer irreparable harm. Accordingly, International Fidelity has satisfied the second prong of the test for issuing a preliminary injunction against STEP and the Indemnitors.

**C. Third Prong: The balance of the equities weighs in International Fidelity's favor because (1) International Fidelity is merely seeking to enforce the terms of the Indemnity Agreement to which STEP and the Indemnitors voluntarily agreed and (2) International Fidelity would continue to be forced to use its own funds to resolve the liability that has been asserted against it absent the entry of an injunction.**

When weighing the real and irreparable injury that International Fidelity will continue to suffer absent the entry of a preliminary injunction and the potential harm the entry of an injunction could theoretically cause STEP and/or the Indemnitors, the balance of the equities undoubtedly weighs in International Fidelity's favor. The Middle District recently explained the balancing of equities in this particular context as follows:

> [The principal] already received its benefit of the bargain by receiving, at low cost and without furnishing collateral, multi-million dollar bonds from [the surety] that enabled [the principal] to receive contracts such as the Lobby Project and Balcony Project. It is unfortunate that [the principal] ultimately was terminated from the Lobby Project by the Navy and was unable to reach an agreement with [the surety] to complete the job. **However, [the surety] is plainly entitled to its end of the bargain — *i.e.*, enforcement of [the principal]'s promise to secure [the surety] against any losses asserted because of [the principal]'s underlying**

>     **failure to perform on a bonded contract**. Therefore, the court finds that the balance of the equities favors [the surety].

*SRS*, 2011 WL 6754072 at *10.  The United States District Court for the Eastern District of Pennsylvania has succinctly described this balancing of the equities between a surety and its principal/indemnitors in this context as follows:

> [T]he issuance of an injunction will only require Defendants to do that to which they agreed — to place [the surety] in funds — and will only permit [the surety] to retain the funds until the rights of [the surety], [the indemnitors], and [the obligee] can be determined. [The indemnitors] are not unfairly prejudiced by being held to the Agreement of Indemnity to which they were signatories.

*Int'l Fid. Ins. Co.*, 2008 WL 1931004 at *7.  The United States District Court for the Middle District of Georgia has described this issue as follows:

> Here, [the surety] seeks enforcement of the terms of the Agreement, which Defendants agreed to willingly.  Defendants assert that they will suffer financial hardship if required to reimburse [the surety] at this point in the litigation.  As surety, [it] is allowed to hold any funds posted by Defendants in trust for payment only of those claims related to the bond at issue.  All other funds necessarily will be returned to Defendants.  Alternately, if the preliminary injunction is not granted, [the surety] will be forced to continue to use its own funds in defense of the claims against Defendants. The balancing of the interests, as currently presented to the Court, weighs in favor of [the surety].

*Great Am. Ins. Co. v. Conart*, 2006 WL 839197, *6 (M.D. Ga. Mar. 29, 2006).  The United States District Court for the North District of Illinois has also described this issue as follows:

> The balance of harms in this case tips in favor of [the surety].  If the injunction is denied, [the surety] will be forced to use its own funds to defend and pay claims despite defendants' promises to the contrary.  This is a serious harm.  If the injunction is granted, defendants will be required to perform as they contractually agreed to do.

*Travelers Cas. & Sur. Co. v. Ockerlund*, 2004 WL 1794915, *5 (N.D. Ill. Aug. 6, 2004).

Therefore, the balance of the equities weighs in International Fidelity's favor. By compelling STEP and the Indemnitors to deposit collateral in relation to International Fidelity's reserve, this Court would merely be requiring STEP and the Indemnitors to perform a task that they voluntarily agreed to perform when they executed the Indemnity Agreement. To the extent the deposit of collateral with International Fidelity may cause financial hardship to STEP and/or the Indemnitors, that financial hardship is exactly the type of risk that STEP and the Indemnitors voluntarily assumed the moment they executed the Indemnity Agreement as an inducement of International Fidelity's execution of the surety bonds on behalf of STEP. Conversely, absent the entry of a preliminary injunction compelling STEP and the Indemnitors to deposit collateral equal to International Fidelity's reserve, International Fidelity will be forced to continue using its own funds to resolve the liability that has been asserted against it under the Bond. Accordingly, the balance of the equities weighs in International Fidelity's favor, International Fidelity has satisfied the third prong of the test for issuing a preliminary injunction against STEP and the Indemnitors.

> **D. Fourth Prong: Compelling STEP and the Indemnitors to deposit collateral security with International Fidelity would strengthen the public interests of enforcing the clear and unambiguous terms of written indemnity agreements, while instilling confidence in the surety industry.**

The issuance of a preliminary injunction against STEP and the Indemnitors will further a number of public interests, including (1) the enforcement of the clear and unambiguous terms of written indemnity agreements and (2) instilling confidence within the surety industry. The Tennessee Supreme Court has noted that "[c]ontract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains." *Ellis v. Pauline S. Sprouse Residuary Trust*, 280 S.W.3d 806, 814 (Tenn. 2009). The Court has also explained that, "[w]hen the parties have reduced their agreement to writing, **the law favors enforcing these contracts as**

**written**." *Id*. (emphasis added). Thus, Tennessee's public interest favors enforcing the terms of clear and unambiguous contracts.

Moreover, the Middle District recently acknowledged that "enforcing surety agreements serves an important public interest by ensuring the solvency of surety companies and supporting the ability of surety companies to provide necessary bonding for public works projects." *SRS*, 2011 WL 6754072 at 10. The United States District Court for the District of Pennsylvania has described a state's interest in enforcing contracts, and the corresponding boost in confidence within the surety industry, as follows:

> **[T]he issuance of a preliminary injunction furthers the public interest by recognizing and enforcing the plain language of a binding surety indemnification agreement**. It is undisputed that [the principal] is a public works contractor and that the performance and payment bonds at issue are public works bonds for a project in Pennsylvania, as required by [Pennsylvania law]. Pennsylvania has an important interest in seeing that the contractors on public works projects use contract funds to perform the work and pay subcontractors and suppliers, as well as adhere to the performance and payment provisions of the contracts and the Pennsylvania Procurement Code . . . . **The grant of a preliminary injunction vindicates this interest and encourages confidence in the surety bond process**.

*Int'l Fid. Ins. Co.*, 2008 WL 1931004 at *7 (emphasis added). The United States District Court for the Southern District of Florida has also recognized that the public has an interest "in seeing that contractual agreements between parties are upheld and in the continued solvency of surety companies for the public benefit." *Developers Sur. & Indemn. Co. v. Elec. Serv. & Repair, Inc.*, 2009 WL 3831437, *2 (S.D. Fla. Nov. 16, 2009).

Thus, by compelling STEP and the Indemnitors to perform their contractual obligation to deposit collateral in an amount equal to International Fidelity's reserve, this Court will further Tennessee's public's interest in enforcing the clear and unambiguous terms of the Indemnity Agreement. Moreover, sureties will be more willing to issue surety bonds in the State of

Tennessee if they are confident that their bargained-for collateral rights will be judicially enforced in the event their principals and indemnitors fail to comply with collateral security provisions. Accordingly, International Fidelity has satisfied the fourth and final prong of the test for issuing a preliminary injunction against STEP and the Indemnitors.

## V. CONCLUSION

For the foregoing reasons, International Fidelity respectfully moves this Court to enter a preliminary injunction compelling STEP and the Indemnitors to deposit collateral security with International Fidelity in the amount of $427,556.46, which equals the amount of International Fidelity's total reserve in relation to the liability that has been asserted against it under the Bond.

Respectfully submitted,

/s/ Jarrod W. Stone
Jeffrey S. Price    BPR No. 019550
Jarrod W. Stone    BPR No. 023915
MANIER & HEROD
One Nashville Place, Suite 2200
150 Fourth Avenue North
Nashville, Tennessee 37219
Phone: (615) 244-0030
Fax: (615) 242-4203
jprice@manierherod.com
jstone@manierherod.com
Attorneys for International Fidelity Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that on this the 17th day of April, 2012, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

/s/ Jarrod W. Stone