# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

INTERNATIONAL FIDELITY )
INSURANCE COMPANY, )
                                )
    Plaintiff, )
                                )
v. )    No.: Case No. 3:12-CV-37
                                )    JURY DEMAND
SOLUTIONS TO EVERY PROBLEM, )
INC., BASIL A. SKELTON, JEFFERY L. )
WOOD, IDA SALISA WOOD, )
NICKAJACK PROPERTIES, LLC, and )
COOL SPORTS, LLC, )
                                )
    Defendants. )

## SUPPLEMENTAL AFFIDAVIT OF JEFFERY L. WOOD

STATE OF GEORGIA    )
                               ) S/S
COUNTY OF FULTON   )

      Comes now the Affiant, Jeffery L. Wood, under oath, and states as follows:

      1.     I am at least 18 years of age and am competent to testify in this matter, and further state that I have personal knowledge of the facts relevant to this matter.

      2.     I am the President of Solutions to Every Problem, Inc. ("STEP"), a general contractor, and I am an individual Defendant in this matter. I have 26 years of experience in the construction industry as a general contractor building various type projects, including projects similar to the Dalewood project involved in this case.

3. As described in my first affidavit, STEP incurred delays and extra costs on the project as a result of problems with the project plans. STEP requested compensatory change orders that were not agreed to by the Dalewood project owner. In the summer of 2009, STEP was over 95% complete with the project, however, there were many late design changes that had to be implemented to satisfy local code officials. Once exterior design changes were approved in November 2009, a Certificate of Occupancy was issued by the City of Albany in January 2010. When the interior design changes were approved in late summer 2010, this work was completed and a certificate of occupancy was issued in November 2010.

4. After the subject project was almost complete in January 2011, the Dalewood project owner terminated STEP's involvement in the project while STEP was completing a November 2010 final punch list provided by the project architect. The circumstances leading to these events are described in paragraphs 13-26 of the STEP Complaint filed in the Fulton County, Georgia Superior Court case which is attached as Exhibit A to the Defendants' Answer in this case. The Dalewood project owner contacted STEP's bonding company, IFIC, after refusing to allow STEP to complete the project punch list.

5. As set forth in my first Affidavit, in response to inquiries from IFIC, I provided information on the Dalewood project and subcontractor payment claims. This information included drawings, change orders, payment requests, and, in fact, included the entire file I had on the project at that time.

6. I was contacted by Gary Bierhalter who advised me that he was a consultant to IFIC and that he was investigating the Dalewood project for IFIC. I cooperated with Mr. Bierhalter and provided him with information and documents concerning the project. To the best of my knowledge and recollection, I am not aware of any documents or information requested by

2

Mr. Bierhalter that I did not provide unless I simply did not have the documents or information to respond to his questions and requests. I have read Mr. Bierhalter's Affidavit that has been filed with the Court. Mr. Bierhalter makes some general statements that STEP did not provide any substantive defenses that IFIC and STEP could use against the Owner's declaration of default by STEP. This is not correct. I do not recall that Mr. Bierhalter specifically requested information from me to support "defenses" or provide a basis for "defenses", but he did ask for information. Unfortunately, Mr. Bierhalter seemed more intent on performing work for IFIC than he did in considering the information that I provided to him. I provided Mr. Bierhalter the following information and discussed this information with him that I believe were and are defenses for both STEP and IFIC to the Dalewood owner claims:

  A. When the Dalewood owner declared STEP in default, the project was over 95% complete. On the day that the Owner had law enforcement officers escort STEP off the project property, we were on site in the process of completing the Architect's final punchlist. I had a meeting scheduled with the project architect for the next week to perform the final inspection. This inspection would have provided the basis for the rest of STEP's retainage, approximately $193,000 to be released. Dalewood declared STEP in default before this meeting could occur and the retainage released.

  B. At the time STEP was declared in default by the Dalewood owner, STEP's retainage on the project had previously been reduced from 10% to approximately 2.5%. This prior reduction in STEP's retainage required the consent of the owner, the project architect, HUD and IFIC and indicated that they considered the project to be at least 97.5% complete.

3

C. On the date that the Dalewood owner declared STEP to be in default, STEP had previously obtained certificates of occupancy for the interior and exterior of the project buildings. The Dalewood owner had also moved tenants into project buildings by this alleged "default" date.

D. HUD representatives performed numerous project inspections and to my knowledge prepared reports of their inspections. I was aware that these reports existed. I discussed with Mr. Bierhalter the fact that these inspections occurred and that there were HUD reports of the inspections. I am not aware that he ever requested or otherwise obtained copies of the HUD inspection reports. I did not have copies of these reports during the project or when I had multiple discussions with Mr. Bierhalter while he was conducting his investigations but I did discuss the existence of the reports with Mr. Bierhalter. Since the lawsuits have been filed, however, STEP's lawyers have obtained the HUD reports through a Freedom of Information Act request. I have reviewed reports obtained from HUD. I have not seen any criticism of the quality of STEP's work in the HUD reports. When Mr. Bierhalter was investigating the project for IFIC, I informed Mr. Bierhalter of the HUD inspections, of the existence of HUD reports, and that I was not aware of any HUD criticism of STEP but that I was aware of HUD comments that I considered critical of the project architect.

E. The project architect never provided any certification that sufficient cause existed to justify termination of STEP when STEP was declared in default by the Dalewood owner. As noted in my first Affidavit, this is a requirement of the contract between Dalewood and STEP.

4

F. The Dalewood owner had not paid to have electricity turned on at the time STEP was declared in default. The Dalewood project is located in a low income area with a high risk of vandalism. I discussed with Mr. Bierhalter that it appeared to me that the owner was asking IFIC to pay for damage done by persons who were not involved in the project construction after STEP was evicted from the project site.

G. I also advised Mr. Bierhalter that the owner had some work done on the project by persons who contracted directly with the owner. I advised Mr. Bierhalter that STEP or IFIC should not have to pay for any deficiencies in work done by these other contractors.

7. In addition to his general statements, Mr. Bierhalter, in paragraph 7 of his Affidavit, asserts that STEP made oral statements of undocumented agreements with the project owner. There were undocumented agreements in some instances. One of the subcontractors involved in a change order pertaining to additional site grassing that exceeded the original estimate went out of business, and I could not obtain the necessary documents from that subcontractor. It is incorrect, however, as stated by Mr. Bierhalter in his Affidavit, that STEP failed to produce "any supporting documentation or other evidence that would allow International Fidelity to assert any valid defense to Dalewood's claim". I am a contractor, not a lawyer, but I considered the information listed in paragraph 6 above as all related to strong defenses that I believed STEP and IFIC had to the Dalewood claim that STEP was in default.

8. Also, there was a disagreement between Dalewood and the City about who would provide street lights for the project. The City took the position that the streets were "private" and that Dalewood had to provide the street lights. Dalewood contended that STEP should pay for

the lights. STEP's position was that whether the City or Dalewood was to provide the lights, it was not STEP's obligation to do so at STEP's cost. I provided Mr. Bierhalter with a copy of STEP's detailed project estimate showing that STEP had not included any costs for the street lights in the estimate or the contract price.

9. I stated in my first Affidavit that after becoming involved in the STEP dispute with the Dalewood project owner, that IFIC acceded to the owner's demands while ignoring obligations to STEP, the principal on the bond. I expected IFIC to act in good faith when investigating the Dalewood project work and to take into consideration the information that I provided, part of which is stated in paragraph 6 above.

10. Mr. Bierhalter initially advised me that he was involved to mitigate the situation on behalf of STEP. He did not include me in any discussions of the takeover agreement that I did not know he was negotiating until shortly before it was signed between Dalewood and IFIC. Although I requested that Mr. Bierhalter meet at one time with all the parties (owner, STEP, HUD and IFIC), he never met with all the project parties in a meeting to establish the parameters of completion work and an agreement of what work needed to be completed. Also, Mr. Bierhalter never asked me for any STEP financial information to allow him to consider whether STEP could complete the project that was in the final punchlist stage. To my knowledge, when Mr. Bierhalter was investigating the owner's declaration of default by STEP, not only did he not meet with any HUD representatives, he also did not meet with the project architect. I noted that his affidavit does not mention any such meetings.

11. Mr. Bierhalter asserts in paragraph 13 of his Affidavit that STEP's work was "deficient and defective." Quite simply, while no contractor's work is perfect, if there were any significant deficiencies in STEP's work, the project retainage, given all the inspections that were

6

done by HUD and the architect, would not have been significantly reduced, certificates of occupancy would not have been issued after City inspections, and the work would not have been in the final punchlist phase with a final inspection scheduled. Mr. Bierhalter exaggerates the situation.

12. In my opinion, based on my years of construction contracting, the most cost effective way to have remedied the Dalewood declaration of default would have been for Mr. Bierhalter and IFIC to have given consideration to the information provided to them and listed in paragraph 6 above. If this consideration had been given fairly and in good faith, there would likely have been no expenditures by IFIC except for an initial limited investigation and perhaps advancing payment of some of the subcontractor payment claims, if IFIC insisted and payment was appropriate, until the project retainage was obtained by STEP from the owner. STEP had "pay when and if paid" provisions in its subcontract agreements.

13. In mid October 2011, Knoxville attorney Loy Waldrop was retained by one of the indemitors, Basil Skelton, to review the Dalewood project situation after I as well as other indemnitors learned that IFIC was negotiating a takeover agreement with Dalewood. Mr. Waldrop wrote a letter to Mr. Bierhalter and Frank Tanzola of IFIC dated November 4, 2011. In that letter, which I understand IFIC admits it received, Mr. Waldrop observed that the Dalewood complaints about project work, to the extent legitimate, could be placed in four categories: (1) completion; (2) warranty; (3) maintenance; and (4) deterioration. Mr. Waldrop requested that Mr. Bierhalter and Mr. Tanzola meet with me, indemnitor Basil Skelton, and STEP Dalewood project manager Andy Wood to discuss the Dalewood claim and what areas of the Dalewood complaints fell into each of the four categories. STEP and the indemnitors were prepared to move forward in good faith to meet with Mr. Bierhalter and discuss these matters before IFIC

7

committed to a takeover agreement. This request to meet was ignored (to my knowledge, no response was ever given to the November 4, 2011 Waldrop letter) and IFIC, instead, proceeded with the takeover agreement

_____
JEFFERY L. WOOD

Sworn to and subscribed
before me this 15th day
of June, 2012.

_Nancy M. Davis_
Notary Public
My Commission Expires: July 16, 2015

Doc. #219

Case 3:12-cv-00037   Document 33   Filed 06/15/12   Page 8 of 9   PageID #: 986

## CERTIFICATE OF SERVICE

      I hereby certify that on this the 15th day of June, 2012, a copy of the foregoing pleading (Supplemental Affidavit of Jeffrey L. Wood) was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

                            /s/ R. Loy Waldrop, Jr.
                            R. Loy Waldrop, Jr. (BPR #000894