UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| INTERNATIONAL FIDELITY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No.: 3:12-CV-37 ) (VARLAN/SHIRLEY) |
| SOLUTIONS TO EVERY PROBLEM, INC., *et al.*, | ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on International Fidelity Insurance Company's Motion for Preliminary Injunction [Doc. 18]. Pursuant to the motion, plaintiff requests an injunction compelling defendants to deposit collateral with plaintiff totaling $427,556.46 pursuant to the parties' Agreement of Indemnity (the "Indemnity Agreement"). Defendants filed a response opposing the request for injunctive relief and requesting a stay of this matter in light of litigation pending in Georgia state court, along with several affidavits in support [Docs. 23, 24, 25, 26, 27, 28], and plaintiff replied [Doc. 30]. The parties thereafter agreed that the hearing on the matter would be limited to oral argument and submitted supplemental affidavits prior to the hearing, which was held on June 19, 2012 [Docs. 32, 33, 34]. For the reasons explained herein, the Court grants the motion.

**I.    Background**

In 2007, Solutions to Every Problem, Inc. ("STEP") entered into a contract with Dalewood Estates Senior Housing, Inc. ("Dalewood") to construct a low-income senior

housing community in Albany, Georgia, which was financed by the United States Department of Housing and Urban Development [Docs. 19, 24]. In accordance with the contract, STEP procured and furnished a payment and performance bond issued by plaintiff, International Fidelity Insurance Company ("plaintiff" or "International Fidelity"), in the amount of $3,299,036.06 [*Id.*; Doc. 20 ¶ 3]. As a condition of the issuance of the bond, plaintiff required STEP to sign the Indemnity Agreement [*Id.*].[1]

In January 2011, when the project was near completion, a dispute arose between STEP and Dalewood [Doc. 24; Doc. 25 ¶ 5]. Dalewood determined STEP was in default and formally terminated the contract [*Id.*; Doc. 19; Doc. 20 ¶ 4]. At the time of termination, defendants state that Dalewood had not paid STEP the contract balance of approximately $193,000, and STEP had performed approximately $400,000 of additional work [Doc. 24; Doc. 25 ¶ 5]. Dalewood, however, withheld the contract funds from STEP, which defendants assert impacted STEP's ability to pay its subcontractors [Doc. 24].

Dalewood subsequently asserted a claim against plaintiff under the bond and sought recovery of, *inter alia*, the cost to complete STEP's unfinished work under the contract, liquidated damages, and lost income [Doc. 19; Doc. 20 ¶ 4]. Hatcher Tractor Service ("Hatcher"), Select Tel Systems, Inc. ("STS"), and Pressley's Electric Service ("PES"), some of STEP's subcontractors and suppliers, also asserted claims against plaintiff and filed

---

[1]The Indemnity Agreement was also signed by Basil A. Skelton, individually and in his capacity as the trustee of Basil A. Skelton's Living Trust, Jeffrey L. Wood, Ida Salisa Wood, Nickajack Properties, LLC, and Cool Sports, LLC (collectively the "Indemnitors"), who are all defendants in this action [See Docs. 1, 18-1].

2

lawsuits against plaintiff and STEP [*Id.*]. In their respective lawsuits, Hatcher sought to recover in excess of $104,501.58 from plaintiff, STS sought to recover in excess of $23,376.24 from plaintiff, and PES sought to recover in excess of $52,876.05 from plaintiff [*Id.*]. In anticipation of potential litigation stemming from the termination, plaintiff retained construction consultant Gary Bierhalter of Bierhalter & Associates, Inc. to assist in plaintiff's independent investigation of the various claims asserted against it [Doc. 19; Doc. 20 ¶ 5].

Plaintiff has settled some of the claims asserted against it, but submits it continues to face substantial exposure under the bond [Doc. 19; Doc. 20 ¶¶ 5, 7]. Plaintiff tendered payment in the amount of $91,556.46 to STEP's attorney, at STEP's request, to fund the settlement of Hatcher's claim against the bond, and the lawsuit was dismissed with prejudice [Doc. 19; Doc. 20 ¶ 6]. Plaintiff also tendered payment in the amount of $31,859.01 to PES to partially resolve PES's claim against plaintiff under the bond, but the lawsuit has not yet been dismissed [*Id.*]. In addition, plaintiff and Dalewood entered into a takeover agreement on November 21, 2011, pursuant to Paragraph SIXTH of the Indemnity Agreement [*Id.*].

Pursuant to a letter dated December 5, 2011, plaintiff demanded that STEP and the Indemnitors deposit collateral with plaintiff in the amount of $336,000 pursuant to the Indemnity Agreement [Doc. 19; Doc. 20 ¶ 8].[2] Neither STEP nor the Indemnitors, however, deposited any collateral with plaintiff [*Id.*]. Plaintiff also states it has paid $343,518.74 in

---

[2] Plaintiff submits that it has established a total reserve of $427,556.46 relative to the claims Dalewood, Hatcher, STS, and PES have asserted against the bond and that the $336,000 did not include the $91,556.46 payment plaintiff advanced to STEP to settle Hatcher's claim.

3

losses and/or expenses under the bond and anticipates it will incur an additional $110,996.40 in losses and expenses [Doc. 19].

On December 21, 2011, STEP filed a complaint and request for declaratory judgment in the Superior Court of Fulton County, Georgia, seeking to recover breach of contract and *quantum meruit* damages from Dalewood and requesting a declaratory judgment against plaintiff preventing plaintiff from entering into the takeover agreement and declaring that STEP has no obligation of indemnity under the Indemnity Agreement (the "Georgia lawsuit") [Doc. 24; Doc. 26]. Plaintiff responded to the complaint, but Dalewood did not respond [*Id.*]. Hence, STEP moved for default judgment against Dalewood [*Id.*]. Default judgment was entered, but Dalewood later moved to set aside the default judgment [*Id.*]. The motion to set aside is currently still pending [*Id.*].

## II. Defendants' Request for a Stay

Defendants assert that this matter should be stayed until the Georgia lawsuit is "completed" [Doc. 23]. As noted, in the Georgia lawsuit, STEP asserts against Dalewood claims for breach of contract and *quantum meruit* [Doc. 26]. Default was entered against Dalewood pursuant to Georgia law because Dalewood failed to respond to the complaint, but Dalewood filed a motion to set aside the default judgment, and that motion has not yet been ruled upon [*Id.*]. The mere pendency of the Georgia lawsuit, however, does not impede this Court's ability to grant the relief that plaintiff is requesting because the federal government and the State of Georgia are separate sovereigns. *See City of Ironton v. Harrison Const. Co.*, 212 F. 353, 355 (6th Cir. 1914) (explaining that "a prior suit pending in a state court will not

4

abate a later suit in a federal court, even if between the same parties upon the same issue, and even if the two courts are in the same district of the same state"). Moreover, there is no dispute that this is the only action in which the Indemnitors are named as parties, which leads the Court to believe that plaintiff could not obtain the requested relief against them in the Georgia lawsuit.

The Court also recognizes that Paragraph SECOND of the Indemnity Agreement provides in part:

> [STEP] and Indemnitors shall deposit with [International Fidelity] on demand an amount of money or other collateral security acceptable to [International Fidelity], as soon as liability exists or is asserted against [International Fidelity], whether or not [International Fidelity] shall have made any payment therefor.

[Doc. 18-1]. Pursuant to this language, defendants' duty to collateralize plaintiff is not conditioned upon STEP's or plaintiff's actual liability to Dalewood; rather, the duty to collateralize is triggered when liability is asserted against plaintiff, and plaintiff has submitted evidence to the Court that such has occurred. In particular, plaintiff has submitted the affidavits of Frank Tanzola, who states that Dalewood and STEP's subcontractors and suppliers asserted claims against the bond [*See* Doc. 20 ¶¶ 4; Doc. 32-2 ¶ 3]. Whether default was entered against Dalewood in the Georgia lawsuit is therefore irrelevant.

Moreover, to the extent that default judgment is upheld against Dalewood or STEP succeeds on the merits against Dalewood in the Georgia lawsuit, it seems plaintiff still has a claim that defendants are obligated to indemnify plaintiff. Indeed, other courts have required principals and indemnitors to indemnify sureties even where the principals obtained

5

rulings that the principals were not actually liable to the obligees and/or bond claimants. *See U.S. Fid. & Guar. Co. v. Jones*, 87 F.2d 346, 348 (5th Cir. 1937); *Hess v. Am. States Ins. Co.*, 589 S.W.2d 548, 551 (Tex. Civ. App. 1979) (citing cases).

Paragraph SECOND further provides:

> [STEP] and Indemnitors shall exonerate, indemnify, and keep indemnified [International Fidelity] from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and the cost of services rendered by counsel, investigators, accountants, engineers or other consultants, whether consisting of in-house personnel or third party providers) and from and against any and all such losses and/or expenses which [International Fidelity] may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of [STEP] or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement.
>
> . . . .
>
> In the event of any payment by [International Fidelity] [STEP] and Indemnitors further agree that in any accounting between [International Fidelity] and [STEP], or between [International Fidelity] and the Indemnitors, or either or both of them, [International Fidelity] shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed. The vouchers or other evidence of any such payment(s) made by [International Fidelity] shall be prima facie evidence of the fact and amount of the liability to [International Fidelity], and of [International Fidelity]'s good faith in making the payment(s).

[Doc. 18-1]. Pursuant to this language, so long as plaintiff made disbursements in good faith and under the belief that it was liable for sums disbursed or that it was necessary and

6

expedient to make such disbursements, it can recover. "[W]hether . . . liability . . . existed" is irrelevant [*see id.*].

Plaintiff, nonetheless, has submitted evidence that leads the Court to believe, at this time, that plaintiff made disbursements in the good faith belief that plaintiff was liable for sums disbursed or that it was necessary and expedient to make such disbursements.[3] In particular, plaintiff submitted the affidavits of Mr. Bierhalter and Mr. Tanzola, which discuss what steps were taken to investigate the claim of Dalewood and how plaintiff came to believe that it was liable to Dalewood and that it should enter into a takeover agreement [*See* Docs. 20, 32]. And the Court notes that Paragraph SIXTH of the Indemnity Agreement provides plaintiff the right to take over and complete any contract for which it issued surety bonds on behalf of STEP:

> In the event of any breach, delay or default asserted by the obligee in any said Bonds, or [STEP] has suspended or ceased work on any contract or contracts covered by any said Bonds, or failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, [STEP]'s conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of [STEP], or the appointment of a receiver or trustee for [STEP], or the property of [STEP], or in the event of an assignment for the benefit of creditors of [STEP], or if any action is taken by or against [STEP] under or by

---

[3] The Court notes that the term "good faith" is defined by the Indemnity Agreement:

> "Good Faith," as used in this paragraph and elsewhere in this Agreement, shall mean honesty in fact and the absence of wilful misfeasance or malfeasance. Neither negligence nor gross negligence shall be deemed the absence of good faith.

[Doc. 18-1].

7

> virtue of the U.S. Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against [STEP] under said Code, or if any action is taken by or against [STEP] under the insolvency laws of any state, possession, or territory of the United States, [International Fidelity] shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of [STEP] and Indemnitors to complete or arrange for the completion of the same, and [STEP] and Indemnitors shall promptly upon demand pay to [International Fidelity] all losses, and expenses so incurred.

[Doc. 18-1]. The affidavits also indicate that defendants did not take the necessary steps to require plaintiff to dispute Dalewood's claim [*See* Docs. 20, 32]. Paragraph THIRTEENTH provides:

> [International Fidelity] shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, *unless* [STEP] and the Indemnitors shall demonstrate to [International Fidelity]'s satisfaction that there is a valid basis to dispute said claim, demand, suit or judgment, and shall in good faith request [International Fidelity] to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, *and* shall deposit with [International Fidelity], at the time of such request, cash or collateral satisfactory to [International Fidelity] in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of [International Fidelity].

[Doc. 18 (emphasis added)]. While defendants state they provided International Fidelity with a valid basis to dispute Dalewood's claim pursuant to a November 4, 2011 letter, plaintiff informs the Court that defendants did not deposit with plaintiff cash or collateral satisfactory to plaintiff, and defendants do not assert otherwise. Accordingly, the Court finds, on the

8

basis of the record before it, that this lawsuit will not become moot even if STEP prevails against Dalewood in the Georgia lawsuit.

For all these reasons, the Court declines to stay this action or a decision on plaintiff's request for injunctive relief until the Georgia lawsuit is resolved.

## III. Plaintiff's Request for Injunctive Relief

### A. Standard of Review

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief if he believes he will suffer irreparable harm or injury during the pendency of the action. Fed. R. Civ. P. 65. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities weighs in his favor, and that an injunction is in the public interest." *Langley v. Prudential Mortg. Capital Co.*, 554 F.3d 647 (6th Cir. 2009) (citation and internal quotation marks omitted). A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

### B. Likelihood of Success on the Merits

The Court finds plaintiff has demonstrated it is likely to succeed on the merits of its claim for specific performance of the Indemnity Agreement's provision for deposit of collateral. "Indemnity agreements are enforceable under Tennessee law, and like other

9

contracts, they are to be enforced according to their plain and unambiguous terms."[4] *U.S. Fid. & Guar. Co. v. Weed*, No. 3:07-1150, 2009 WL 77262, at *3–4 (M.D. Tenn. Jan. 8, 2009) (citations omitted); *accord Great Am. Ins. Co. v. SRS, Inc.*, No. 3:11-cv-970, 2011 WL 6754072, at *6 (M.D. Tenn. Dec. 23, 2011) (citing *Hardeman v. Cnty. Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995)); *Ohio Farmers Ins. Co. v. Special Coatings, LLC*, No. 3:07-1224, 2008 WL 5378079, at *16–17 (M.D. Tenn. Dec. 28, 2008); *Lyndon Prop. Ins. Co. v. Houston Barnes, Inc.*, No. 3:04-cv-174, 2005 WL 1840254, at *4 (E.D. Tenn. July 26, 2005). "[T]he clear language must be interpreted and enforced as written even though it contains terms which may be considered harsh and unjust by a court." *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 511 (Tenn. 2001); *accord SRS*, 2011 WL 6754072, at *6. Also, specific performance of a collateral security obligation of an indemnity agreement is recognized as an appropriate remedy under Tennessee law. *SRS*, 2011 WL 6754072, at *7; *Safeco Ins. Co. of Am. v. Criterion Inv. Corp.*, 732 F. Supp. 834, 843 (E.D. Tenn. 1989) (applying Tennessee law and holding that "[s]ureties are ordinarily entitled to specific performance of . . . collateral security clauses" (citation omitted)); *see also First Nat'l Ins. Co. of Am. v. Sappah Bros. Inc.*, 771 F. Supp. 2d 569, 574 (E.D.N.C. 2011) (recognizing "that a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages" (citations omitted)).[5]

---

[4]It appears to the Court that Tennessee substantive law applies, as the parties are diverse and neither asserts otherwise.

[5]Plaintiff has submitted a list of cases indicating that courts around the country have held the same.

10

Paragraph SECOND of the Indemnity Agreement provides:

> [STEP] and Indemnitors shall deposit with [International Fidelity] on demand an amount of money or other collateral security acceptable to [International Fidelity], as soon as liability exists or is asserted against [International Fidelity], whether or not [International Fidelity] shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by [International Fidelity].

This clear and unambiguous language allows plaintiff to demand that defendants post collateral in the amount of the reserve set by plaintiff in the event liability exists or is asserted against plaintiff, and here, as noted, liability has been asserted against plaintiff by Dalewood and STEP's subcontractors and suppliers [Doc. 20 ¶¶ 4; Doc. 32-2 ¶ 3]. Indeed, defendants do not dispute that liability has been asserted against plaintiff.

Defendants, however, assert there is no valid basis for defendants to indemnify plaintiff because default judgment has been entered against Dalewood in the Georgia lawsuit. As previously discussed, although default has been entered, Dalewood is seeking to set aside the default. Moreover, the contract language allows plaintiff to demand collateral whenever liability is asserted against plaintiff; thus, whether default has been entered is irrelevant. And courts have required principles and indemnitors to indemnify sureties even where the principals obtained rulings that the principals were not actually liable to the obligees and/or bond claimants. *See Jones*, 87 F.2d at 348; *Hess*, 589 S.W.2d at 551 (citing cases).

Defendants also assert that they have a defense to the liability asserted against plaintiff and thus need not provide the collateral security demanded by plaintiff. In particular, defendants assert that Dalewood was in breach of its obligations of its contract with STEP

11

when it terminated STEP, so plaintiff's obligations under the bond were not triggered. Yet, the case law relied upon by defendants in support of this proposition, *Cincinnati Ins. Co. v. Savarino Constr. Corp.*, No. 2:08-cv-1061, 2011 WL 1068022 (S.D. Ohio Mar. 21, 2011), is distinguishable from the case before the Court. In *Savarino*, the collateral security provision provided:

> If for any reason the Surety shall deem it necessary to set up or to increase a reserve to cover possible liability, loss, attorneys' fees and expenses *for which the Undersigned will be obligated to indemnity [sic] the Surety*, under the terms of this Agreement, the Undersigned will deposit with the Surety, immediately upon demand, a sum of money equal to such reserve and any increase thereof as collateral security to the Surety for such liability, loss, attorneys' fees and expenses . . . .

*Id.* at *21 (emphasis added). Thus, whether the indemnitors were required to collateralize the surety was conditioned upon whether they would be obligated to indemnify the surety. Such, however, is not the case here. Here, the duty to collateralize exists regardless of whether defendants will be obligated to indemnify plaintiff. The propriety of Dalewood's termination of its contract with STEP, therefore, is irrelevant.

Finally, defendants assert that plaintiff acted in bad faith in investigating the claims of Dalewood and STEP's subcontractors and suppliers. While there is nothing in the Indemnity Agreement that indicates the parties intended to condition defendants' duty to provide collateral on a finding that plaintiff acted in good faith in demanding the collateral security, plaintiff has nonetheless submitted evidence that seemingly refutes this point and demonstrates that plaintiff likely acted in good faith, as defined by the Indemnity Agreement,

12

in investigating Dalewood's claim and demanding the collateral security [*See* Docs. 20, 32]. For example, plaintiff hired a construction consultant to investigate the claims and requested information from defendants about the claims [*See id.*]. In addition, the Court is cognizant that other courts have found that an asserted defense of lack of good faith does not defeat a surety's right to a preliminary injunction for specific performance of the collateralization obligation. *See*, *e.g.*, *Sappah*, 771 F. Supp. 2d at 574 ("While the issue of whether [the surety] acted in good faith may be relevant to whether [the indemnitors] ultimately are liable [to the surety] for indemnification under their agreement, it is irrelevant to whether [the indemnitors] are required to post collateral security preliminarily."); *Int'l Fid. Ins. Co. v. Vimas Painting Co.*, No. 2:07-cv-298, 2009 WL 485494, at *5 (S.D. Ohio Feb. 26, 2009) ("There is nothing in the language of the indemnity agreement to indicate that the parties intended to condition [the indemnitors'] payment of the $500,000 on a finding that the [surety] acted in good faith in demanding the collateral security."); *Far W. Ins. Co. v. J. Jetro Excavating, Inc.*, No. 2:07-cv-11-PRC, 2008 WL 859182, at *11–12 (N.D. Ind. Mar. 28, 2008) (requiring collateral to be deposited, notwithstanding assertion that surety had failed to act in good faith).

    **C.    Irreparable Harm**

It appears that plaintiff will suffer irreparable harm in the event an injunction requiring defendants to deposit the demanded collateral security is not issued. The Middle District of Tennessee has recently recognized that "courts have routinely found that sureties suffer immediate, irreparable harm if they are denied receipt of collateral after liability has been

13

asserted against them." *SRS*, 2011 WL 6754072, at *8 (citing cases). And it was persuaded that the bargained-for objectives of the collateral security provision—including insurance that plaintiff is fully collateralized before it sustains additional losses, protection from any loss that might result from the indemnitors' insolvency and/or dissipation of assets, motivation that the indemnitors will promptly resolve outstanding claims, and creation of a fund from which the surety may resolve liability that has or may be asserted relative to the bond—would not be achieved without an injunction. *See id.* This Court is likely persuaded.

Defendants assert plaintiff has already obtained the right to the $193,000 contract balance, so it has some security. It appears that plaintiff possesses the right to receive the balance of the contract as collateral, separate and apart from the collateral contemplated by Paragraph SECOND, however, pursuant to Paragraph THIRD of the Indemnity Agreement. That provision provides:

> [STEP], the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to [International Fidelity], as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of [STEP] to [International Fidelity], whether heretofore or hereafter incurred, the assignment in the case of each bonded contract to become effective as of the date of the bond covering such contract, but only in the event of (1) of any abandonment, repudiation, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds . . . [a]ny and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which [STEP] has an interest.

[Doc. 18-1].

14

The Court nonetheless finds defendants' argument persuasive in that it would be unfair to grant the requested injunction without taking the $193,000 into consideration. The Court will therefore, as a condition of granting the injunction, require plaintiffs to post a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure in the amount of $193,000.[6]

### D.     Balance of the Equities

Plaintiff also has persuaded the Court that the balance of the equities favors granting injunctive relief. Plaintiff is merely attempting to enforce its right to collateral security under the Indemnity Agreement, an agreement into which defendants voluntarily entered, and courts have found that this satisfies the equities-balancing test. *See SRS*, 2011 WL 6754072, at *9; *see also Int'l Fid. Ins. Co.*, 2008 WL 1931004, at *7 (finding that equities favored the surety because "[t]he issuance of an injunction will only require the [indemnitors] to do that to which they agreed—to place [the surety] in funds—and will only permit [the surety] to retain the funds until the right of [the surety], [t]he indemnitors, and [the obligee] can be determined. [The indemnitors] are not unfairly prejudiced by being held to the Agreement of Indemnity to which they were signatories"). Indeed, defendants have already received their end of the bargain by receiving a multi-million dollar bond from plaintiff that enabled STEP to enter into the contract for the housing project. Plaintiff, moreover, would be forced

---

[6]The Court notes that plaintiff's counsel represented during the hearing that plaintiff had not yet received these funds, but counsel did not refute that plaintiff would receive the contract balance.

15

to use its own funds to resolve the liability that has been asserted against it absent the entry of an injunction. *See Travelers Cas. & Sur. Co. v. Ockerlund*, No. 04 C 3963, 2004 WL 1794915, at *5 (N.D. Ill. Aug 6, 2004) (finding that the equities favors the surety because the indemnitors "will be required to perform as they contractually agreed to do," thereby avoiding "serious harm" to the surety, which would otherwise need to use its own funds to resolve asserted claims). And the Court notes again that defendants had a mechanism to require plaintiff to contest Dalewood's claim, but defendants failed to adhere to that mechanism.

E. **Public Interest**

"'Contract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains.'" *SRS*, 2011 WL 6754072, at *10 (citation omitted). Further, enforcing surety agreements serves the public interest "by ensuring the solvency of surety companies and supporting the ability of surety companies to provide necessary bonding for public works projects." *Id*. (citing cases). Accordingly, the public interest would be served by granting the requested injunction.

IV. **Conclusion**

For the reasons explained herein, the Court hereby **DENIES** defendants' request for a stay [Doc. 23] and **GRANTS** International Fidelity Insurance Company's Motion for Preliminary Injunction [Doc. 18]. Defendants are **ORDERED** to deposit collateral with plaintiff totaling $427,556.46 within seven (7) days from the date of this order. This relief,

however, is conditioned upon plaintiff posting a bond with the Clerk in the amount of $193,000, which shall be posted within four (4) days from the date of this order.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE